May I please the court? My name is Letizia Kritsch and I'm here on behalf of the petitioner. Could you bring the microphone a little bit closer so we can be sure to hear every word? Sure. There are two issues that I would like to address before this court. The first one would be the immigration judge's adverse credibility finding, which was adopted and confirmed by the Board of Immigration Appeals. The second issue would be the timeliness of the filing of the asylum claim. We don't really have any jurisdiction over it. That's what I was going to actually say. No, we can't hear that one. The government addressed that issue, said that petitioner waived that issue, but actually the court doesn't have jurisdiction. We're focusing on withholding of removal and recapture. With regard to the adverse credibility determination by the immigration judge and the Board of Immigration Appeals, I would like to note that the standard of review would be the substantial evidence standard. What's your best argument as to why the IJ here, the credibility finding, the adverse credibility finding is not supported by the record? Well, because there are no inconsistencies in the petitioner's testimony. What about the city he left from? Excuse me? What about the city that he left from? Well, there was an issue with this, but the government provided a document stating that the itinerary of the ship, and this itinerary was listing Houston as a city where the ship stopped, which is, I believe, not possible because Houston is not a city port. That's really not a comparable situation. There is a port in Houston, and there is a waterway from the Gulf up to the edge of the city of Houston, and the distance is something like 16 miles. But a cursory look at the map of the Ivory Coast reveals that San Pedro, compared to the capital, is several hundred kilometers apart. So it's not possible, I don't think, to suggest that San Pedro is so close to the capital that when the capital is listed as the departure point, San Pedro is like a close-in suburb. It's not. It's a distant separate city. That's true. But if I may, Your Honor, this document was submitted by the government the day of the hearing. We know that. We know that you were given five days to provide rebuttal or commentary, and as I recall, nothing was provided. So I don't see how you can now say, well, the evidence has to be ignored because it was filed with late notice. There was a corrective measure, and you didn't take opportunity to contest that. I was not actually the attorney of record in front of the immigration court. That's true. He was given not the opportunity to refute that evidence, but five days when the government had that documentation and didn't provide it until the merits. That's the record. You're stuck with it. I understand you went to the Council of Records. We're not faulting you for not doing more with the late document, but that's the record. You're stuck with it. That's true. But actually, this was only one of the points that the immigration judge said that the petitioner was not credible, but there were certain points where the record doesn't support that finding. Actually, with regard to the identification of the petitioner, there was some testimony that he provided some identification documents at the asylum office, some original documents, but the immigration judge disregarded his testimony. Well, I thought that copies of those documents are in our record and were before the immigration judge. Copies were provided at the asylum office, but at the time that the petitioner went to the interview, he brought with him some original documents. I understand the originals may not have gotten to the immigration judge, but isn't it the case that copies of those same documents were before the immigration judge? They were, yes, but the judge was saying that at least the attestation of identity was not a valid document because there was a date of August 2003. That has something to do with whether it's an original versus whether it's a copy. Well, apparently the originals were brought to the asylum office and taken back to the asylum officer and didn't make their way to the government file that was at the immigration court. I understand that, but I didn't see that the immigration judge rejected identity based on copies versus originals. The date was the problem, it seemed to be, not whether it was a copy. Well, but the date, there's a reason for the date being different. The judge was saying that she had a doubt about the validity of the identification, the identity attestation, because it had a date of August 2003 when the petitioner testified that he was given that document in September 2002. Now, there was an explanation as to why that document had that date of August 2003. Well, the judge said there were about five explanations which she regarded as being inconsistent with one another. What's your response to that? I didn't read five explanations. I understand that the petitioner was not very articulate in his explanation, but the sense of his explanation was that the document was given to him and was valid for one year. That's the time that it takes for the government of Ivory Coast to issue a new identification card. Well, even that doesn't quite fit, which seemed to be troubling the immigration judge, because if he got it in, I forget now whether it was September, August, or August-September, but it's not a year, it's 11 months, so it still doesn't quite fit. Well, it might depend if, I mean, I don't know what kind of documents or how the documents are issued by the Ivory government, Ivorian government, but he explained that it was going to be valid for a certain amount of time and that deadline was- Let me ask you a basic question and it might help. It looks to me like any objection to the quality of the translator's work was waived because counsel didn't complain, didn't object, didn't file motions, prior counsel, of course, in front of the immigration judge, and the issue, as far as I could tell, of faulty translation was not raised again by prior counsel at the Board of Immigration Appeals. So I'm assuming that we are going to have to treat any objection to the quality of translation as waived. But my question to you is this. Are we allowed, you think, to consider the apparent quality of the translation despite the waiver? I believe so because with regard to that issue, I think that I have a little bit of insight. I was born in France, so when I attend a hearing where my client is French-speaking and there is an interpreter, sometimes I'm able to quote that the translation is not correct and I can make the court aware of it. Unfortunately, if the previous counsel was not fluent in French and, you know, we cannot ask that of, you know, every counsel who represents a client- I guess my question is, is there any authority you can cite us to that would allow us to consider the apparent problems with the translation even though an objection to the translation was not properly made and, therefore, the issue would seem to be waived? Is there any authority saying, nevertheless, we can consider it? Well, I would say in question of fairness, the court could, so as Ponce said, take this argument and- Well, if you're familiar with the Ninth Circuit case, it's either He or Huey, then maybe you can submit a 28-J letter if you want, but it's Huey, H.E. v. Ashcroft, 328 F3rd 593. It's the 2003 Ninth Circuit case where they talk about the fundamental fairness that you've just mentioned in terms of the due process violation where a translator was apparently horrendous and was not objected to, but if you want to respond to that via 28-J letter with a copy to Ms. Friedman. I will, Your Honor. Thank you. You should do that within a week. Thank you, Your Honor. I would like also to bring the issue of the time and manner of entry in the U.S. where the judge- I understand that this court doesn't have jurisdiction to address the timeliness of the entry. However, there was a finding of adverse credibility on that issue, and I think that the court has jurisdiction to determine if there was substantial evidence to the contrary. I agree with the court that there was a big inconsistency with regard to the testimony, the San Pedro departure, city of departure, or Abidjan, but there was also a lot of documents actually that I believe the judge did put a lot of weight in those documents showing that the petitioner was in Philadelphia in December 2003, and therefore when he filed his application for asylum in December 2004, he did this in a timely manner. She seemed to conclude that yes, he was in Philadelphia as of December 2003, but he might well have been in Philadelphia as of December of 2002. What is unreasonable about that interpretation of the affidavits? Well, it's not that it's- those affidavits, he received affidavits of somebody he was absolutely not related to, no friends. That's another question. Let's assume that he clearly established that he was here within a year. That doesn't mean that he wasn't here more than a year. I could figure that I've been in Philadelphia for the past 10 years. That doesn't mean that I didn't reside here for the past 20 years, and if he can't show that he came no longer than 365 days from the date of the filing, there's no asylum jurisdiction. The judge was mentioning why didn't he get affidavits from the ship personnel, but unfortunately when a stowaway comes through- Yeah, but we don't have any jurisdiction on the date issue. You lost that. But this is impossible for a stowaway or like in a very rare case to show that he, you know, something from the- Did you consider it a little bit surprising as you studied the record that, at least if my recollection is correct, the judge talked a lot about the testimony of your client and apparent or possible inconsistencies between and among different things he said. But as far as I recall, she made no discussion at all of the documents that were also in the record. So, for example, she says we don't even know if he is who he says he is. But one of the documents in the record is an apparent identification card that, at least to me, looks official and it has his picture on it. So why can't she look at his face on the witness stand, look at the picture and say, I think this is the same guy or I think it's not the same guy. But she makes no mention that I could remember or see in her opinion about the affidavits or the photo identification document. It seems that for her, the fact that he was cross-examined by the government and there was a problem with the city of departure, all the rest of his testimony was not credible. And with regard to the identification card, I believe that she restricted her view and said that only an ID card, an original ID card could identify this person. She didn't even look at the record. At one point, she never looked at the country reports. No, she didn't. Did she look at any of the records? Is there anything on this record to tell us that she really did look at the record and that he got a hearing in its full due process sense before Immigration Judge Mills? And she also limited... But that was a question. I'm sorry. Is there anything in the record to show that he got, and I probably should ask Ms. Friedman, that he got a thorough hearing that the country reports clearly were not looked at and it appears that she may not have looked at the ID paper and then expressed doubts about who he is? No, I think the record that I've seen showed that she is at least substantiating her findings based on those conditions, on those reports. Okay, well, I understand your argument. Did you use your time, Ms. Friedman? Excuse me? Yes, I did use your time. Why don't we hear from Ms. Friedman and look at your back? Good morning. I believe I can still say good morning. Where am I watching? Give or take a few minutes. It doesn't matter. Good day. Either way, good day. The one on the wall is not on daylight. If you wait six months, then it will be correct. But I'm Nancy Friedman on behalf of the Attorney General. And in the interest of getting to the Phillies game, does the Court have any questions for me? I have a preliminary question on something that troubles me. On page 25, the brief for the government appears to be signed by you. Is that your signature? Yes, Your Honor. And you signed it after writing the brief? Yes, Your Honor. Did you proofread the brief before it was submitted, before you signed it? Yes, I did. Well, can you explain why in the penultimate line of page 10, there's reference to, quote, he would be tortured by the government of Indonesia on his return? This case doesn't involve Indonesia. This case involves only the Ivory Coast. Yes, Your Honor. I apologize for my mistake in proofreading it. How about on page 18, where there's about the eighth line down, there's a discussion of – sorry, I gave you the wrong page number. On page 13, there's reference to involuntary sterilization. The second line on the top of 13, there's no sterilization issue in this case. This is a torture-type case, not a birth control in China-type case. Isn't that right? Absolutely, Your Honor. I apologize. I offer no excuse. Is what happens here that these are canned briefs that are on a computer and it just spits out paragraph after paragraph and page after page that sometimes involve facts of other appeals that are utterly irrelevant to the appeal before us? No, Your Honor, absolutely not. I apologize for my errors in proofreading, but I gave this case careful consideration and must have read the record about 10 times before completing this in an effort to really understand the petitioner's testimony and to make sense of it. There are no prefabricated paragraphs that are routinely repeated from one brief to another? Absolutely there are, Your Honor. We don't reinvent the standard of review and so forth for every brief, and that's why sometimes mistakes are made like that.  The government expects every judge on every panel in every case to carefully read everything in the brief, and that's not unfair or unreasonable, but it seems like under reciprocity, the counsel for the government ought to very carefully read every line in every brief before they ask us to so read it. I agree 100 percent, Your Honor. The translation that Dustin gave me really is a problem, and as Ms. Petra is saying, the official language of the Ivory Coast is clearly French, but I have done some traveling in West Africa, and I've been in situations where even very learned individuals, including in one case a justice of the Supreme Court, had to have a proceeding that we were sitting in, in a traditional court in Ghana, translated to him because he couldn't understand a single word that was being spoken amongst the people who were composed in that tribunal, and I say that only by way of suggesting to you that the translation here, if you read it, the only conclusion is that even though the interpreter said at one point, he understands me, I don't know what caused the interpreter to conclude that. It seemed to be a real communication problem, but even beyond that, the impression I get from reading this, and as you can imagine, we read a lot of these, not as many as you do, but certain themes kind of play out as you read some of these hearings, and clearly some immigration hearings you get the feeling that the immigration judge was more involved in the questioning and perhaps more skeptical of the claim going into the hearing than in others. I was frankly dumbfounded when she asked him to describe the wounds in his head, how deep were they, were they bumps, and he testified that he was bleeding, he was covered in blood, his face was covered in blood, and she's not satisfied. Can you describe the wounds? How do you describe a wound in your head, other than to say it's bleeding? He then says it's bleeding, my head was covered in blood, and she says, well, how did you know it was bleeding? How did you know it was a cut, was it an open wound? How did you know that? That really does seem to me like the kind of question that is only logical if the person asking the question was hell-bent on making certain that this person did not get the release that he had asked for and that she was going to try to shoot holes in everything he said. Otherwise, how do you explain that? As my clerk said the other day, how deep can a wound in the head be? If it's more than three or four millimeters, you're dead, because it goes into the brain. It can't be a very deep wound by definition. I just don't get that. As Judge Michel said in an earlier argument, he appreciated when someone gives a reasonable answer as a reasonable person. My opinion also is I don't know how else he could have described a head wound other than the information he did give. Ms. Friedman, this is only meant platonically. I love you. We just don't get those kinds of very candid answers very often. I respected you going into this. I don't think you've argued for me just because of your position. But, boy, you just ratcheted through the show. Thank you, Your Honor, because I have, in spite of the typos in my brief, I thought long and hard about the record in this case. That's the most important part, because we know the law. The case law is well known. It comes up over and over. But let me ask you this. You seem to agree, at least to an extent, that the trouble that I.J. had on credibility in relation to the head wound doesn't make much sense, doesn't make any sense. And yet when you look at the BIA reviewing opinion, not only is it short, not only is it one judge, and not only does it hardly discuss any facts at all, but when it does discuss facts, they're limited to the alleged inadequacies in his testimony about his own head wounds. And, to me, it raises the question Judge McKee put his finger on before. Did the BIA judge even read the record, even read the rest of the I.J.'s opinion, because she gives about ten grounds on credibility, and the only one he selects is the one that, in my opinion, makes no sense at all. So that makes me think he might not have even read her opinion. Did he read the testimony? Did he worry about the translation? Did he read the documents? There are a lot of documents in this case, affidavits and other documents, and I don't get any sense at all that the immigration judge or the board of appeals member mastered this record at all. And it causes me a lot of concern. In fact, the judge said she didn't look at the country reports, which corroborates what he said about the reason he was taken into detention and beaten because his father was a chauffeur for, I can't pronounce the name, but for the former head of the Ivy Coast. The country reports corroborate all that. She never looked at them. She just kind of thumbs through it. Well, you've raised a few points. If I could try to answer your comments, beginning with the translation. I'm a little surprised, actually, that it's come up the way it has today, because I don't believe that the petitioners even raised that to this court. No, it's quite right. It's only whether we ought to worry about it and whether we're permitted to worry about it, which may be unclear because of the waiver point. But assuming for a moment that we're permitted, authorized to consider it, along with everything else in the record, it looks very worrisome to me. It looks like the translation was very poor. Well, again, I'm not sure how one would reach that conclusion because the issue of the translation did come up at one point, near the beginning of the hearing, and the translator specifically said, we do understand each other, we have different accents. The translator stated what country he was from and said we understand each other. I don't believe. The translator said that, but at one point the judge even said, are you guys communicating here? And the interpreter said, no, no, he understands me. I don't know what the interpreter based that upon, but the judge even at one point said, duh, I don't get the feeling that there's a lot of communication here. Well, again, that was not an issue that the petitioner raised before the board. It wasn't raised. It was waived. If it's resurrectable anyhow, that's a different matter, but we agree it was waived. Okay. Let me ask this thing. The thing about, he clearly was wrong or disingenuous about his departure cities. That I think we can all agree on. What troubled me about it is, I don't know what difference it makes. He got here somehow, and he got here illegally somehow, and there's a good chance he was on that ship because he said that he stowed aboard a ship with cocoa beans. In the manifest, whatever document was produced for the ship says, on that ship that he said left from one city, left from another city, but the cargo on that ship was cocoa beans. It seems to me he was on the ship. So it doesn't matter where he hopped on the ship. It might be troubling. From which city you're saying, in the Cote d'Ivoire, from which city did the ship embark? Right. What difference does it make? I think it makes a difference for this reason. It was one factor added to a list of factors that the immigration judge found to be incorrect. Go through that list. I'll go through the list. The one factor is he's here, and he is either the luckiest person in the world and guessed that there were cocoa beans on that ship, or he should be playing the Powerball Lottery every day. This guy wouldn't have any problems. He could go back and be the head of the African for the money he'd win. But anyhow, the other thing that troubled her is the head wound, which I think even you can see troubled you. The thing about the documents, there's clearly some confusion about whether or not the parents' and the family's identity papers were brought to him by the general, or whether or not those were obtained him from a friend. The IJ was concerned that he wasn't able to get some official corroboration from his friend who was telling the Ivory Coast, which I know we're supposed to defer to the immigration judge, but sometimes I read these things, and I scratch my head, and I wonder what planet they're living in. If the Ivory Coast is as repressive a country as we all know it to be, who in their right mind is going to go poking around and go ask the government, you know that family you killed the other day because they were the wrong political allegiance? I need an official document from you saying you slayed them. That's a really fast ticket out of here. So the fact that that was incorporated seems to me to be a kind of a ridiculous burden to put on Isiaka. As I go through it, not everything is in that category, but there's so many things that are either very irrelevant, ridiculous like the head wound, or very inconsistent with the kind of claim he's bringing. That is why you don't have any official documents from the government. Of course he doesn't have any official documents from the government because nobody in their right mind who values their life who's still in the Ivory Coast is going to go to the local sheriff, whatever they have there, and ask for any kind of official document about their misconduct. They're not going to do it. Of course. It's just unreasonable to think otherwise. The medical testimony is another one. The medical testimony he got was he got some painkillers. I don't think he said he was stitched up. There's some disagreement about that. It wasn't like he was admitted to the intensive care unit for two weeks, in which case you'd expect him to show up in an earlier asylum. He got a very inconsequential, quote, medical treatment, which may not even have been from someone that you and I recognize as being a physician. There's so many little things in here which just add up to be kind of, at least to my mind, a tribunal which is hell-bent on making sure that this guy's story did not get him any kind of relief. Well, I can understand your questions about the various points you raised, but I will respectfully disagree with the conclusion you reached that the immigration judge was simply trying to support a preconceived idea that she was going to deny relief. Well, what about the appearance that I get reading the transcript that instead of direct examination, very soon we get into cross-examination by the judge of the applicant, so that it looks like it's the judge against the applicant, not the applicant's lawyer being allowed to put on the case for withholding and CAT and so on? It has a very bad appearance to me that the questions are coming from the wrong lawyer. Well, I think that the petitioner was well-represented by counsel here who did get a full and fair opportunity to present his case. He raised the issue about the translator, which may have been the kind of case that if you pull that, the whole thing unravels. Well, I know this Court has examined many cases in which the transcript reads with problem after problem with translations to the extent that it's just either unreadable or incomprehensible. And I always wish the lawyer would raise the issue, and they never do. I don't know why that is, but I always wish the lawyer would raise the issue. What do you make of the fact that there was so much early questioning? It's one thing if after the two lawyers are done, the judge asks a lot of questions in a trial-type court. But where the direct examination of the one and only live witness is heavily dominated by the trial judge, that looks pretty odd to me. What do you make of it? Well, I disagree, Your Honor, that it's odd because in this case, this hearing began with the immigration judge recognizing that the petitioner had submitted a pretty detailed affidavit and that it wasn't necessary for him to repeat everything that was in the affidavit. But when he didn't repeat it, that was an issue of being disingenuous. The medical testimony, he didn't repeat it with the same level of particularity that was in the written report. And the fact that he didn't repeat it was taken as an omission that undermined his credibility. It's kind of a gotcha. No, I disagree, Your Honor, because as I say, the petitioner was given every opportunity to present whatever evidence and or testimony he had. In fact, as you recall from the record, the immigration judge at the conclusion of the testimony didn't give her oral decision that day. It was a week or so later, at which date she asked, you know, did you have any supplementary evidence and so forth. So I don't think it's fair to say he wasn't given a full opportunity to present his case, which is really the bottom line that you're asking about. I'm really wondering whether the immigration judge was biased, and whether we didn't have a fair trial because of an attitude on the part of the judge manifest very early in the questioning of the applicant, which really turns into a cross-examination being conducted by the judge, not by the government's attorney after direct disfinishment. Let me try this. This may not work. And I don't want to put you in a bad position or to cause you to go on the unemployment rolls. But given the concerns that at least the two of us appear to have, I can't speak for Judge Mitchell, but I certainly have them. Given the concern that even you are sensitive to about this ridiculous cross-examination about his head wounds, and given the statement by the immigration judge herself that she didn't look at the country reports, and then finds he's not telling the truth because there's no corroboration, and what she didn't look at would have corroborated his testimony. In the interest of fairness, what would be the problem with simply demanding it for another hearing before a different immigration judge? If he loses, he loses. If the other immigration judge finds him credible, then it's a new ballgame. At least I'm withholding and Kat is out of the window. He can't do anything about that. May I just comment on a couple of things? And I will directly answer your question. And one, so that my boss doesn't yell at me tomorrow. We can shred the tape. There's a lot of shredding going on. There's a trial right now about shredding. We have a lot of shredding. We can shred the tape. Excellent, because in some courts, the oral transcript is on the internet for everyone to listen to. Ours is not, and if it were, we could manage for a virus to hit the internet that way. Excellent. Be brave. Just be brave. That's right. Do the right thing, as they say. I try to. Regarding the head wounds, I certainly, as I said earlier, have to agree that I don't understand the immigration judge's conclusion on that particular point. On the country report, though, I have to disagree that the immigration judge didn't read it or address it. I think, to the contrary, there was discussion about the fact that the 2003 country report was in the record and then she asked, well, isn't the 04 report available, the most current? The government's counsel said, yes, it is, and referred to a particular portion of it. So I don't think it's accurate to conclude. But she didn't say she hadn't read some things that were behind the tab in the record, and she thought it was something other than what it was. I guess she said she thought it was part of something that she had already read, and it turned out to be a whole different country report. But I don't think it's unreasonable to conclude that the immigration judge didn't review the whole record before giving her decision. I don't understand why. I thought she said that. That was during the hearing, of course, Your Honor. So may I return to your question where you asked, what would be the harm in remanding it to a proceeding before a new immigration judge? New judge of fairness, right. And the answer is that if this court concludes that the adverse credibility finding is not supported by substantial evidence and the evidence compels a different result, then, yes, that is what the court needs to do is to remand it, not to find the petitioner credible. And I know I'm saying things that you well understand. This is not the kind of record I don't think where we could find him credible. I don't think on this record we've done that. Well, that somewhat in a way answers the question, because I believe it's a case where reasonable minds could differ on that conclusion. Let me ask you this. Do you consider it genuinely disputed by the government that the general his father worked for was assassinated, along with a lot of other people? Did you consider it genuinely disputed by the government that his father was killed the same day in the same neighborhood, apparently by the same militia-type force? Did you consider it genuinely disputed by the government that the mother was killed when the house was ransacked? I mean, if there's no dispute that means anything about these kind of facts, and isn't the common sense risk if we send this guy back to the Ivory Coast, he'll probably get imprisoned, tortured, or killed or something very serious? Well, I think there's a big leap in there in a couple of ways, Your Honor. First of all, you asked about whether the government disputes that the general was killed, whether it was Jouer or Gay or however one pronounces it. The answer is no. It's in every State Department report after 2002, so the answer is no. But whether his father was who he claims he was is a whole different story altogether. We couldn't, no party could produce evidence that the father was the driver, and even if he was, whether he was killed that day. I carefully- Well, his statement is evidence, and there's no contrary evidence, and so the ruling turns totally, I think, on the fact finder, Judge Mills, saying, well, I just don't believe anything he says. Therefore, he establishes no fact by any proof, and therefore his case is a zero, and therefore he has to lose. And in the context of this case, that somehow doesn't seem quite right to me because there's so many facts that seem not to be disputed, and the government's contrary evidence is essentially limited to the departure point of the ship. But it's not the government's burden, Your Honor, and there's the problem. Of course it's not, of course it's not. We know that. I know you do, but I simply return to that basic point because it's a petitioner who had an opportunity to bring forward certain evidence. Once he brings forward the evidence that has been summarized- Excuse me, Your Honor. Once he brings forward the evidence that has been summarized, you don't have the burden of persuasion, but you do have the burden of going forward, or else the evidence that he has produced will be substantial to satisfy his burden. What is the government going forward with to undermine the finding that would flow from his own evidence, that his father was a chauffeur? Again, the only thing on the record one way or another is his testimony. I don't know how you would refute that, but I don't know how he would establish it. Again, you can't go to the people on the African coast and say, can I get some kind of record telling folks in the United States that I'm accusing you of murder? Can you get some document to me saying that you murdered my father? He can't. Well, of course not, Your Honor. It's got to be his testimony. Right. He refuses to say that. The answer to your question is by adding up all the other inconsistencies that the immigration judge pointed out, whether you think they're worthwhile, significant, minor, or out and out wrong, you know, she did list a number of them. You know, it seems to me the only one that strikes me as significant is the issue about his pharmacy. He says Dad was the driver for the general head of state, and he also said his father was a farmer. I don't know enough about the Ivory Coast to conclude that that's necessarily inconsistent. I know a lot of agrarian societies where that would be very, very likely, even for the head of state, to have somebody as a chauffeur who is also a farmer. Maybe not today or tomorrow, but was a farmer a few months ago. Right. And I couldn't speculate about that, Your Honor, since it's not in the record. But what I can do is refer back to, you know, the other inconsistencies that the immigration judge did point out. She also did point out. Some of the things that the immigration judge considered inconsistencies don't look to me like inconsistencies at all. They look like other facts that describe other parts of the picture. They're other pieces of the puzzle, but they're not in conflict. They're just other facts that fill out the picture. Is the blind person describing? Perhaps it's better to say omissions or use some other word rather than inconsistencies. But she did point out a number of things that she thought could have been done to corroborate his story that weren't done. And she just found his explanations unpersuasive. What could he have done to corroborate his story that weren't done? Well, one thing she pointed out was get some affidavit or letter or something from the man that he claimed he lived with in San Pedro for a year. Before you go through that, that guy's not going to say a word. Common Sense tells me that guy is not going to say any word, not going to write any letter, any piece of paper. If he's asked by the authorities over there if he even knows Bayou, he's going to say no. You've never heard of him, never met him. He's not my friend. You're assuming, you may be assuming, the immigration director is assuming that if he sends something in the mail, when he seals the envelope and drops it in the mail, it's not going to be opened until it gets to where it's going. And it's not going to be opened by anyone other than the intended recipient. But that's true in almost all the asylum cases, Your Honor. That's exactly right. What do you make of the affidavit where he describes the ship experience? Where he says, I thought the ship was headed for Naples because something was marked Naples. I took enough food and water to sustain me between Ivory Coast and Naples. Lo and behold, the ship doesn't stop. It's at sea for 16, 18 days, something like that. The food runs out. The water runs out. I'm down in the hold. And as a result, I'm severely malnourished. He maybe didn't use that word. It's my characterization. And to the point of no fresh air, no sunlight, no fruits, no vegetables. So he emerges from the hold and shinnies down the rope with a horrendous skin condition. And lo and behold, the affidavit of the lady from Philadelphia who met him in that time period, December of 2003, describes this horrible skin condition. And there's a description of him being taken to two different hospitals to get treatment for the skin condition, which is exactly what you would expect somebody who's been deprived of food and water in the dark hold of a cargo ship to have by way of physical manifestation. That tells me he sure as heck was on that ship. And the immigration judge says nothing about that, nothing about the affidavit, nothing about the detail he gives, nothing about the corroboration by the lady who works in City Hall who took him to these hospitals. Well, I think she did refer to it. You may disagree with the conclusion she came to about it because she did say, well, that shows he was here in December of 2003. Well, she used it to deny his asylum claim. But clearly, well, we can go round and round on this, but clearly you understand that at least I am in trouble. I think at least one of my colleagues is in trouble. And I'm just trying to again think of, in the interest of fairness, given what the state here, given this guy may well meet a very horrendous end if we make a mistake. And what's on the flip side? Is there any indication this guy's committed criminal offenses or he's on the dole and doesn't have a job or he's created a problem in the community? As far as I can surmise, it's not clear, but as far as I can surmise, he's behaved properly for the five years he's been living in Upper Darby. That may be absolutely correct or it may be totally the opposite. I don't know the answer. Well, if it was an arrest record, I'm sure that the government would have brought it to somebody's attention. That's though, you know, going back to the time of the hearing, that brings up the problem of his identity. And when you don't have certain identity documents, you just can't establish who you are, you know. What about the picture? She never mentions the fact that he looks just like the picture on the government identification document that's in the record before her. She never mentions it. Again, Your Honor, those were copies, so it's difficult. But the photo is there. Yes, it's a copy of an original photo. But the question is, does the copy match the face of the guy on the stand? Of course, that's correct. The problem is that unless you have an original, you can't give the government an opportunity to examine the original document to verify its authenticity. If the rule of law that comes out of that is anybody without an original identification document is automatically suspect, we would have a lot of folks being shipped back that shouldn't be shipped back. He testifies he turned in the original to the asylum officer for DHS, and they somehow never got it to the immigration courts. That's not his fault. That was unclear, Your Honor. That was, you know, honestly unclear in the record because I also marked the page where the counsel for the petitioner, Mr. Osborne, said, I got the originals back. So it's just not clear to me if there were originals or if so what may have been. It's very hard to figure out what was going on. I admittedly read the record numerous times to try to straighten out his testimony as best I could. Well, that's a very great point of distinction that you studied the record so carefully, and you have a mastery of it because you're able to answer our kind of pointed questions, and I wish all counsel were that careful in reading the record. Well, again, I apologize for typos in my brief, but thank you for your time this morning. Thank you. I think that you deserve rebuttal. You don't want to take rebuttal, do you? Okay. All right. Thank you. Thank you very much. Please rise. This court stands adjourned until Thursday, October 30th at 930 a.m.